*XC Denise*

IN THE UNITED STATES COURT
DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

00 NOV 22 AM 9: 25

*[signature]*
CLERK ALBUQUERQUE

WARREN HARRIS, and
ROSE HARRIS,

    Plaintiffs,

-vs-

           No. CIV 99-00748 RLP/DJS

VINCE CRESPIN, personally and in his
official capacity, RON MADRID, personally
and in his official capacity, SHERIFF
BENJAMIN MONTAÑO, SANTA FE COUNTY
SHERIFF'S DEPARTMENT, personally and in his
official capacity, and THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF SANTA FE,

    Defendants.

## PLAINTIFFS' REQUESTED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the order of the Court, and the Federal Rules of Civil Procedure, Plaintiffs

submit herewith their Requested:

### FINDINGS OF FACT

1.  Warren Harris ("Harris") and Rose Harris are citizens of the United States and the

State of New Mexico.  They were married in February 1976, and they have been married until

the present time.  (Testimony of Harris).

2.  Harris is a career prosecutor.  From 1972 until 1975, he was an assistant district

attorney in the Second Judicial District of the State of New Mexico, serving from 1973 until

1975 as the chief trial attorney. From June 1975 until June 1976, he started the first criminal

division of the New Mexico Attorney General's Office, as deputy attorney general in the

criminal division.  From 1980 until 1986, he was an assistant district attorney in the Thirteenth



Judicial District of the State of New Mexico, and from 1987 until 1991, he was a senior assistant and deputy district attorney of the First Judicial District of the State of New Mexico. From January 1993 until July 9, 1999, he was chief deputy district attorney of the Thirteenth Judicial District of the State of New Mexico. (Testimony of Harris).

      3.     At all times pertinent hereto, Vince Crespin ("Crespin") and Ron Madrid ("Madrid") were deputy sheriffs with the Santa Fe County Sheriff's Department and were acting within the scope of their employment and under color of state law. (Stipulated)

      4.     Crespin was working at the New Mexico State Santa Fe County Courthouse on June 6, 1997, and he was responsible for security at the courthouse. (Stipulated)

      5.     Mrs. Harris' mother, Annie Tapia, was murdered on March 23, 1995. Her murder remains unsolved. On June 6, 1997, a probate hearing was held before Judge Michael Vigil on the second floor of the Santa Fe County Courthouse. This was a very emotional hearing, as it involved the involuntary sale of the property known as the Tapia Building. It was a closed hearing and only the heirs and their attorneys were allowed to attend. Harris went to the courthouse with Mrs. Harris and sat outside of the courtroom in the hallway while the hearing was taking place. During the hearing, Detective Mark Clayton of the Santa Fe Police Department visited with Harris in the hallway. Detective Clayton was the police officer investigating the murder of Annie Tapia. (Testimony of Harris).

      6.     While Harris was waiting outside Judge Vigil's courtroom, he was told that a friend of his, and fellow attorney, Ira Robinson was on the first floor of the courthouse and wanted to speak to him. Harris went to the first floor of the courthouse in front of Judge Herrera's courtroom to speak to Mr. Robinson. This courtroom is directly across the hallway from the sheriff's office in the courthouse. (Testimony of Harris).

7.     As Harris was talking to Mr. Robinson, his brother-in-law Anthony Tapia (who had attended the probate hearing) came up to Harris excited and said, "They're arresting Joe. They're arresting Joe," referring to Mrs. Harris' brother, Joe Tapia, who had also attended the court hearing before Judge Vigil.   Mr. Tapia was a well-known attorney in Santa Fe. (Testimony of Harris).

8.     Harris looked up and saw three deputies escorting Mr. Tapia down the stairs towards him.  He was immediately concerned because it is unusual to have three deputies involved in placing a single person under arrest, unless it is for a very serious offense, such as murder.  Certain family members had made accusations that Mr. Tapia had somehow been involved in the murder of his mother.  (Testimony of Harris).

9.     The deputies were escorting Mr. Tapia to the deputy's office across from the hallway from where Harris was speaking to Mr. Robinson.  Harris walked into the deputy's room, introduced himself, and asked why they had arrested Mr. Tapia.  No one answered Harris' question, and Harris once again asked why Mr. Tapia was arrested; he had a right to know. When no answer came, Harris added that he was his brother-in-law and wanted to know why they had arrested Mr. Tapia.  (Testimony of Harris).

10.     A deputy in the sheriff's office responded, "We have a bench warrant," Harris asked what the bench warrant was for, and the deputy said that Harris had to speak to the corporal (Crespin).  Harris asked Mr. Tapia, who was being held against a wall in the office if he knew why he was arrested and Mr. Tapia shook his head "No."  Harris still did not know why Mr. Tapia had been arrested.  (Testimony of Harris).

11.     Harris turned around and asked Crespin if he would tell Harris why they were arresting his brother-in-law.  Crespin answered "No."  Harris then stated that he had right to

know, whereupon Crespin stated it was a bench warrant. Harris then inquired what the bench warrant was for and Crespin responded by stating, "Get out of my office" and started pushing Harris out of the office with his chest. Harris turned around and told Crespin, "You've got to tell me why you're arresting Joe Tapia." Harris never threatened Crespin. (Testimony of Harris; Testimony of Crespin).

12.     Crespin asked if Harris was a lawyer and when Harris responded affirmatively, Crespin wanted to know if he was Mr. Tapia's lawyer. Harris responded that he was not; he was his brother-in-law, but a lawyer would be right behind him. Crespin continued to refuse to tell Harris why Mr. Tapia was arrested. He just stood there in the hallway. (Testimony of Harris).

13.     At this point, Crespin and Harris were in the hallway and Crespin told Harris to either quiet down, leave the area, or be arrested. Harris responded that he would but just wanted to know why they were arresting Joe Tapia. Harris complied with Crespin's directive to be more quiet. (Testimony of Harris).

14.     While they were standing in the hallway, Harris saw Mr. Tapia being taken down the hallway in handcuffs towards the holding cells. He said, "Look, there he goes. Why are you arresting him? You've got to tell me why you're arresting Joe Tapia." Crespin thereupon poked Harris in the shoulder and said, "You're going to jail." Harris was then handcuffed and placed in the holding cells at the courthouse jail with Joe Tapia. (Testimony of Harris).

15.     Jim Yontz, ("Yontz") a deputy district attorney with the Seventh Judicial District of the State of New Mexico, was an assistant district attorney of the First Judicial District from 1990 until 1997. On June 6, 1997, he was attending a criminal docket call in Judge Herrera's courtroom. After attending to certain cases in Judge Herrera's courtroom, he left the courtroom

4

and attended to other business, then sat in some chairs located between the exit to the courthouse and Judge Herrera's courtroom waiting to be called for other cases. (Testimony of Yontz).

16.    Yontz knew Harris since they previously worked together in the district attorneys office of the First Judicial District. Yontz also knew Mrs. Harris and Crespin. (Testimony of Yontz).

17.    While Yontz was seated in the chairs, approximately ten or twelve feet away from Harris, he heard Harris' voice demanding to know what was going on. He looked up and saw that Harris was speaking to Crespin. He heard Crespin tell Harris that if he did not leave or be more quiet, he would arrest Harris. Harris asked, "Arrest me for what? I just want to know what is going on." When Harris made this last statement, he was arrested. (Testimony of Yontz).

18.    Harris was not loud or shouting. Both he and Crespin spoke in a stern, business-like attitude. Yontz characterized their tone of voice as one of "command presence." Yontz never saw Harris advancing or making any threatening gestures toward Crespin. (Testimony of Yontz).

19.    Yontz was a police officer with the Salt Lake City Police Department from September 1976 until June 1982 when he completed law school. Yontz does not know what Harris was arrested for, but presumed it was for disorderly conduct. However, what he saw was not disorderly. There was no disturbance of anything and no need to arrest Mr. Harris. (Testimony of Yontz).

20.    Yontz' opinion based upon his experience as a prosecutor and a police officer, was that based upon what he saw, there was no probable cause to arrest Harris. He viewed the situation as a family concerned about the arrest of Mr. Tapia with Harris acting as the

spokesperson of the family.  The easiest thing to do would have been to explain to Mr. Harris why Mr. Tapia was in fact being arrested. (Testimony of Yontz).

21.     Crespin knew exactly why Mr. Tapia was arrested.  Deputy Sheriff Bryan Martinez ("Martinez") was informed by a Santa Fe police officer on June 6, 1997, that there was an outstanding warrant for Mr. Tapia and that he had been seen in the courthouse.  When Martinez gave this information to Crespin, Crespin called the Santa Fe Police Department, and asked that a copy of the warrant be sent to him via facsimile to his office in the courthouse. Crespin received the warrant and noted it was issued by a Santa Fe municipal court judge to "hold for a hearing."  (Testimony of Crespin; Martinez; Defendant's Exhibit A).

22.     Upon receiving a copy of the warrant, Crespin told Martinez to make contact with Tapia, bring him to the office and advise him of the warrant in the office.  Crespin had planned to execute the warrant in the office because he knew Mr. Tapia to be an attorney in Santa Fe.  In fact, Mr. Tapia had represented Crespin's brother, who had also served as an officer in the Santa Fe County Sheriff's Department.  (Testimony of Crespin).

23.     Martinez went to the courtroom where the closed estate hearing was being held and then escorted Mr. Tapia to the Sheriff's office where Crespin was.  (Testimony of Martinez; Testimony of Crespin).

24.     Lisa Griego, who was a secretary for Judge Art Encinas since June of 1977, was present in the courthouse at the time of the incident.  She knew Harris since he previously worked for the district attorneys office and she also knew Crespin.  (Testimony of Griego).

25.     A New Mexico state police officer came to her office and advised her that Mr. Tapia wanted to speak to her.  She went downstairs to the holding cell on the first floor of the courthouse and saw Mr. Harris and Mr. Tapia.  After speaking to them, she walked to the deputy

sheriff's office and asked Crespin why he had arrested Harris. Crespin answered, "He had an attitude." Ms. Griego advised Crespin that Harris was a deputy district attorney and Crespin responded, "Well, if I would have known that, I would not have arrested him; but he just had an attitude." (Testimony of Griego).

26.     Ms. Griego also spoke to deputy Alfred Archibeque about the arrest and he was asked why Mr. Harris was arrested, he responded, "I don't know; I don't know anything. Just ask Vince." (Testimony of Griego).

27.     While she was in the holding cell speaking to Mr. Tapia, she asked him why he had been arrested, and he responded that he did not know; they would not tell him. (Testimony of Griego).

28.     There was not only no probable cause for Harris' arrest, there was no justification for it at all. No reasonable officer could have believed that probable cause existed to arrest Harris.

29.     After Harris was arrested, he was transported to the Santa Fe County detention center by Crespin. In the squad car on the way to detention center, Harris told Crespin that he could not put him in the jail because individuals that Harris might have prosecuted might be in the jail. He stated that it was too dangerous for him to be in the jail. Crespin did not respond. (Testimony of Harris).

30.     While Harris was being fingerprinted at the jail, Crespin came over to him and said, "Mr. Harris, I'm sorry. If I had known who you were, this would not have happened." (Testimony of Harris).

31.    Crespin invented a criminal charge and filed a final complaint only as an after thought knowing at the time that the charge was without merit, but wanting to harass Harris and deter any complaint from Harris which might charge Crespin with unlawful conduct.

32.    Crespin prepared a criminal complaint at the detention center using a notebook with the statutes in it.  In the criminal complaint, Crespin alleged under oath that Harris "did engage in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct, which tended to disturb the peace." (Plaintiffs' Exhibit 11).

33.    However, Crespin admitted that Harris did not engage in violent, abusive, indecent, profane, or any other conduct set forth in the criminal complaint except for being "loud." (Testimony of Crespin).

34.    The General Rules of Conduct of the Standard Operating Procedure of the Santa Fe County Sheriff's Department requires sheriff's deputies to maintain an even disposition and remain calm, regardless of provocation in executing their duties.  (Testimony of Crespin).

35.    Crespin understands this to mean that you have to be thick-skinned, be able to take lashings from the public or people one deals with on a daily basis.  A deputy is not to let an individual he is dealing with to provoke him into an argument. This means, that if someone is yelling at you or using cuss words at you, you are supposed to take it. (Testimony of Crespin).

36.    The General Rules of Conduct of the Standard Operating Procedure of the Santa Fe County Sheriff's Department also requires deputies to assist the public in any reasonable request.  Crespin acknowledged that Harris' request to know why his brother-in-law was being arrested was a reasonable request.  However, Crespin acknowledged  that he never told Harris what the warrant was for, although he claimed he did tell Harris that it was a bench warrant. (Testimony of Crespin).

37.     Harris was kept in the booking area (not a jail cell) at the Santa Fe County Detention Center for approximately two hours.  His personal property was taken away from him, including a $200 straw hat which was crushed beyond repair.  After remaining in the booking area for about two hours, Harris was told he could leave.  Harris was released with no papers and without posting any bond, although Crespin had ordered that a $200 bond required.  Harris was under arrest and in custody a total of four (4) hours.  (Testimony of Harris; Testimony of Crespin).

38.     As the officer in charge of courthouse security, Crespin was familiar with the Standard Operating Procedure of the Court Security Unit.  (Exhibit 15).  This standard operating procedure required deputies to pick up court dockets from each division in the courthouse at the start of each day and ascertain the need for extra security in the courtrooms.  It also required security to maintain a calendar log for the dockets indicating the date and if the court had a docket.  Crespin said that his deputies did not comply with this requirement of the standard operating procedure.  Instead, the secretary of each judge took a copy of the daily docket sheet to his office.  That way, he would get a docket sheet from every judge that was holding court that day.  On the morning of June 6, 1997, he knew that there was going to be a hearing involving the estate of Annie Tapia.  Crespin personally knew Annie Tapia.  He knew she was murdered and that her murder was unsolved.  Under these circumstances, he knew that probate hearing could be very emotional.  (Testimony of Crespin).

39.     Following Harris' arrest, Crespin spoke to Madrid, knowing that as the press officer, Madrid would be speaking to the press about Harris' arrest.  (Testimony of Crespin; Testimony of Madrid).

9

40.     Madrid thereupon gave information to the press without speaking to Harris concerning the arrest. As a result, negative articles were published in the Santa Fe New Mexican, Albuquerque Journal, Westside Journal, and Rio Rancho Observer (Exhibits 7-10). There were also several radio broadcasts in Belen, New Mexico, over Station KARS which negatively portrayed the arrest. (Testimony of Harris). This publicity all took place in the Thirteenth Judicial District were Harris was chief deputy district attorney.

41.     The arrest and publicity had a devastating effect on Harris. Commencing on June 11, 1997 through December 3, 1999, Harris saw Dr. Roland Sanchez, M.D., a total of eighteen times for depression and symptoms directly related to the arrest. Harris suffered depression, sleep disorders, difficulty at work, difficulty concentrating, a lack of energy, hatred and anger towards police, hypertension, and sexual dysfunction. Harris related to Dr. Sanchez that he was having nightmares and fears directly resulting from the arrest. He related that he could no longer command or lead his fellow employees and felt that he lost their respect. Dr. Sanchez treated Harris with zoloft, prozac, and lithium. He diagnosed Harris with suffering from post-traumatic stress disorder which he still continues to have to this day as a result of the arrest. (Testimony of Sanchez).

42.     Dr. Sanchez's opinion, to a reasonable degree of medical and psychological probability is that Harris' depression, post-traumatic stress disorder, and resulting symptomology were caused by Harris' arrest. (Testimony of Sanchez).

43.     At Dr. Sanchez's insistence, Harris started seeing Dr. Clifford Morgan, a psychologist, to treat the post-traumatic stress disorder and depression. Harris saw Dr. Morgan for twelve sessions in nine months for treatment of the post-traumatic stress disorder and depression which were caused by the arrest. Dr. Morgan's opinion is that while Harris had

10

suicidal ideations, he did not have a direct intention to harm himself. He met the criteria for post-traumatic stress disorder and depression.

44.     Dr. Morgan's opinion, to a reasonable degree of psychological probability, is that Harris' post-traumatic stress disorder and depression were, to a reasonable degree of psychological probability, caused by his arrest and subsequent trial. The post-traumatic stress disorder and depression continued throughout the course of his treatment of Mr. Harris. (Testimony of Dr. Morgan).

45.     Harris' post-traumatic stress disorder and depression substantially interfered with his ability to perform his duties as chief deputy district attorney of the Thirteenth Judicial District. He was ultimately terminated on July 8, 1999. Harris' inability to perform his job was proximately caused by the depression and post-traumatic stress disorder resulting from his arrest and trial. (Testimony of Harris; Mike Runnels; Dr. Sanchez; and Dr. Morgan).

46.     At various times, Harris had contemplated running for attorney general, district attorney, or seeking positions with the United States Attorneys Office or as a district court judge of the State of New Mexico. With his arrest, Harris considered his reputation to be destroyed to such a degree that he could never seek public office. (Testimony of Harris).

47.     The criminal complaint which Crespin filed against Harris (Exhibit 11) came on for trial in the Santa Fe County Magistrate Court. On February 11, 1998, the court granted a defense motion for a directed verdict after the state rested its case, and the criminal charges against Harris were dismissed. (Exhibit 12).

48.     Crespin's testimony that Harris' speech to him constituted disorderly conduct; that the encounter caused a crowd between five and twenty-five persons to gather in the

immediate area around Crespin and Harris; and that there was a security risk involving the prisoners in the holding cells as a result of encounter is not credible.

49. No one came out of any of the courtrooms to complain of the volume of Harris' speech. (Testimony of Harris; Testimony of Crespin).

50. Judge Steven Herrera learned of Harris' arrest and ordered that Harris and Tapia not be taken to the Santa Fe County Detention Center. Notwithstanding this knowledge, Crespin transported Harris to the detention center to be booked. (Testimony of Rose Harris; Testimony of Crespin).

51. Prior to Harris's arrest on June 6, 1997, there were other pre-existing stressors acting upon Harris and Mrs. Harris. These included:

A. March 23, 1995: Annie Tapia was murdered.

B. Late 1995 or early 1996: Harris' father had an operation for a brain hematoma.

C. Harris' mother broke her hip after his father had the brain hematoma.

D. Harris' father had prostate cancer.

E. Late 1995: Rose Harris had a deep venous thromboembolism (DVT).

F. February 5, 1996: Mrs. Harris was diagnosed with breast cancer.

G. March 1996: Mrs. Harris had surgery for breast cancer in which both of her breasts were removed.

H. Following her breast cancer surgery, Mrs. Harris had chemotherapy for the cancer.

       I.       August 1996:  Mrs. Harris encountered sepsis (a bacterial infection) resulting from the chemotherapy and she was hospitalized from August 10, 1996 to August 12, 1996.

       J.      Late November or early December 1996:  The chemotherapy terminated.

       K.     The stress of the unsolved murder of Annie Tapia.

       L.      The emotional court hearing to sell the Tapia Building.

(Testimony of Harris; Mrs. Harris; Dr. Sanchez).

52.     Mrs. Harris saw Dr. Sanchez at least eight times for depression, anxiety, sleep disorders, stress, crying spells, and post-traumatic stress disorder directly resulting from Harris' arrest on June 6, 1997.  (Testimony of Dr. Sanchez, Testimony of Mrs. Harris; Exhibit 6).

53.     Sanchez's opinion, to a reasonable degree of medical and psychological probability is that the foregoing symptoms were proximately caused by the arrest of Mr. Harris on June 6, 1997.  (Testimony of Dr. Sanchez).

54.     Harris incurred attorney's fees and costs totaling $10,213.55 in defending himself on the criminal case brought against him by Crespin (Testimony of Harris).

55.     Harris and Mrs. Harris incurred bills totaling $1,148.00 with Dr. Roland Sanchez as a proximate result of the arrest of Mr. Harris on June 6, 1997. (Testimony of Harris; testimony of Sanchez),

56.     Harris incurred bills totaling $900 with Dr. Clifford Morgan, Ph.D. as a proximate result of his arrest by Crespin on June 6, 1997.  (Testimony of Harris; Testimony of Morgan).

57.     When Harris was terminated from his employment with the Thirteenth Judicial District, he was earning a salary of $67,689 per year.  When he was hired by the district attorney of the second judicial district, he was earning an annual salary of $59,475, a difference of

of the second judicial district, he was earning an annual salary of $59,475, a difference of $6,689.28. This difference, multiplied by two years (the time to Harris' retirement) amounts to $13,378.56. (Testimony of Harris; Exhibits 3, 4).

58.    When Harris was employed by the Thirteenth Judicial District, he had use of a state car. He no longer has use of this vehicle and is now required to commute over 100 miles per day to go to work and return home. The federal per diem rate for use of a vehicle is 31¢ per mile. This amounts to a loss to Harris of $16,120 for a period of two years. (Testimony of Harris).

59.    Harris has incurred attorney's fees and costs herein.

## CONCLUSIONS OF LAW

1.    The Court has subject matter jurisdiction of all of the claims asserted by the Plaintiffs herein.

2.    The Court has personal jurisdiction of the parties, and venue is properly laid in this district.

3.    Harris was arrested and prosecuted for violating Section 30-20-1(A), NMSA 1978, which provides:

> Disorderly conduct consists of: engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace;

4.    Crespin did not have probable cause to arrest Harris for disorderly conduct in violation of New Mexico law on June 6, 1997. Crespin's arrest violated the law which was clearly established on June 6, 1997. Crespin is not entitled to qualified immunity for his acts.

5. The New Mexico Court order granting Harris a directed verdict at his criminal trial is binding on the defendants in this case.

6. Crespin's arrest of Harris on June 6, 1997 violated his constitutional rights protected by the Fourth Amendment to the United States Constitution, and his conduct as herein stated, constitutes the torts of assault, battery, false imprisonment, false arrest and malicious abuse of process under New Mexico law.

7. As a proximate result of Crespin's conduct herein Harris has suffered actual damages totaling $350,000.00.

8. As a proximate result of the conduct of Crespin, Rose Harris has suffered a loss of consortium and she is entitled to damages in the amount of $150,000.00.

9. Plaintiffs are entitled to their attorney's fees and costs incurred herein, which shall be determined at a later date by the Court.

MARCHIONDO, VIGIL & ASSOCIATES, P. C.
Attorneys for plaintiffs
P. O. Box 568
Albuquerque, NM 87103
505 247-0751

By _____
Michael E. Vigil

I certify that a copy of the foregoing was hand-delivered to the following this ___22___ day of November, 2000:

Randy S. Bartell
300 Paseo de Peralta, Suite 200
Santa Fe, NM 87501

_____
Michael E. Vigil

15