



FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

00 NOV 22  AM 8: 47

CLERK

IN THE UNITED STATES COURT

DISTRICT OF NEW MEXICO

WARREN HARRIS and
ROSE  HARRIS,

           Plaintiffs,

                                   No. CIV 99-00748 RLP/DJS

-vs-

VINCE CRESPIN, personally and in his
official capacity, RON MADRID, personally
and in his official capacity, SHERIFF
BENJAMIN MONTAÑO, SANTA FE COUNTY
SHERIFF'S DEPARTMENT, personally and in his
official capacity, and THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF SANTA FE,

           Defendants.

### DEFENDANTS' PROPOSED FINDINGS OF FACT
### AND
### CONCLUSIONS OF LAW

        In accordance with the minute order served on the parties on October 5, 2000, defendants

submit the following proposed findings of fact and conclusions of law.

#### FINDINGS OF FACT

    1.      Plaintiffs and Defendants are residents of the State of New Mexico.  (Stipulated)

    2.      At all times pertinent hereto, defendants Cpl. Vince Crespin ("Crespin") and

Major Ron Madrid ("Madrid") were deputy sheriffs with the Santa Fe County Sheriff's

Department and were acting within the scope of their employment and under color of state law.

(Stipulated)



3.      At all times pertinent hereto, defendant Benjamin Montaño was the Santa Fe County Sheriff and was acting within the scope of his employment and under color of state law. (Stipulated)

**Probable Cause For Arrest Of Warren Harris**

4.      Crespin was working at the Santa Fe County courthouse now known as the Judge Steve Herrera Judicial Complex ("courthouse") on the afternoon of June 6, 1997 and was responsible for security at the courthouse.  (Stipulated)

5.      The Sheriff's Office serving the courthouse is located in a restricted area. (Stipulated)

6.      The restricted area of the courthouse is designated as such by instructions of the presiding judges of the First Judicial District.  (Testimony of Crespin; Benjamin Montano)

7.      A large sign is painted on the wall at the entrance to the restricted area advising persons in the courthouse that the area is restricted and that no loitering is allowed.  (Defs' Exhs D and E; testimony of Crespin)

8.      The restricted area of the courthouse includes the hallway on the western side of the ground floor of the courthouse which provides access to two courtrooms.  (Def's. Exh. F; Testimony of Crespin)

9.      The Honorable Steve Herrera was conducting proceedings in the courtroom nearest the entrance to the restricted area on the afternoon of June 6, 1997.  The Honorable James Hall was conducting proceedings in the courtroom on the far end of the restricted area hallway.

2

(Defs' Exh F; testimony of Crespin)

10.     June 6, 1997 fell on a Friday.  Both Judge Herrera and Judge Hall were hearing criminal matters on the afternoon of that day.  In-custody prisoners were present in their courtrooms for the criminal proceedings.  (Testimony of Crespin, Deputy Martinez, Doug Couleur, Jeff Jones, Jim Yontz)

11.     The instructions of the presiding judges to the Sheriff's Department are that the restricted area be kept clear of persons who are not going to or coming from the two courtrooms. (Testimony of Crespin, Benjamin Montano)

12.     In addition to the instructions from the presiding judges Crespin and the other deputies assigned to the courthouse were to follow the directives of the Standard Operating Procedures of the Sheriff's Department, including but not limited to SOP 7-15, Court Security Unit.  (Defs' Exh G; testimony of Crespin)

13.     The restrictions were placed for two reasons: (1) to maintain security in the area due to the necessity of moving in-custody prisoners in and out of the courtrooms opening off of the restricted area and (2) to keep large crowds from forming in the hallway and disrupting the judicial proceedings in the courtrooms.  (Testimony of Crespin, Benjamin Montano)

14.     On June 6, 1997, at approximately 2:45 p.m., Joseph Tapia ("Tapia") was in the courthouse and was taken into custody by Santa Fe County Sheriff's Deputy Bryan Martinez ("Deputy Martinez") pursuant to a valid bench warrant.  (Stipulated)

15.     The bench warrant instructed the officers to arrest Tapia and to hold him for a

3

hearing.  (Def. Exh. A; testimony of Deputy Martinez )

16.    Deputy Martinez took Tapia to the Sheriff's Office to explain the warrant to Tapia
and to complete the arrest without attracting a crowd.  (Stipulated)

17.    Crespin had instructed Deputy Martinez to be discreet in with Tapia because
Crespin knew Tapia and wanted to save him from any undue embarrassment.  (Testimony of
Crespin)

18.    Deputy Martinez showed Tapia a faxed copy of the bench warrant and verified
that Tapia was the person named in the bench warrant.  (Testimony of Deputy Martinez)

19.    Tapia did not indicate to Deputy Martinez that the reason for the issuance of the
bench warrant was not known to him.  (Testimony of Deputy Martinez)

20.    Plaintiff Warren Harris ("Warren Harris"), Tapia's brother-in-law, was also in the
courthouse at that time.  When he learned of Tapia's arrest Warren Harris went to the Sheriff's
Office to demand information about why Tapia was being arrested.  (Stipulated)

21.    Warren Harris encountered Crespin at the door to the Sheriff's Office.
(Testimony of Warren Harris, Crespin)

22.    At that time, Tapia was in the Sheriff's Office with Deputy Martinez who was
explaining the bench warrant to Tapia.  (Testimony of Deputy Martinez)

23.    Warren Harris demanded that Crespin inform him of the reason for Tapia's arrest.
(Testimony of Warren Harris, Crespin)

24.    Crespin informed Warren Harris that Tapia was being arrested pursuant to a

4

bench warrant.  (Testimony of Warren Harris, Crespin)

25.    Warren Harris then demanded to know the reason for the issuance of the bench warrant.  (Testimony of Warren Harris, Crespin)

26.    Upon inquiry by Crespin, Warren Harris disclosed that he was an attorney but confirmed that he did not represent Tapia.  (Testimony of Warren Harris, Crespin)

27.    Warren Harris told Crespin that Tapia was his brother-in-law.  (Testimony of Warren Harris, Crespin)

28.    Warren Harris persisted in demanding to be informed of the charge on which the bench warrant had been issued and became increasingly louder as he repeated his demands. (Testimony of Crespin, Deputy Martinez, Deputy Alfred Archibeque, Deputy Marcos Armijo)

29.    Crespin instructed Warren Harris to quiet down and to clear the restricted area. Crespin warned Warren Harris that if he did not comply with these instructions he would be arrested.  (Testimony of Warren Harris, Crespin)

30.    Crespin informed Warren Harris that he would be allowed to visit Tapia in the courthouse holding cells after Tapia's arrest because Warren Harris was an attorney.  (Testimony of Warren Harris, Crespin)

31.    The volume and character of the speech directed to Crespin by Warren Harris was loud and similar to the volume and character of speech used by Warren Harris in examining witnesses in court.  (Testimony of Warren Harris)

32.    As Warren Harris was addressing Crespin they were standing approximately two

5

to three feet apart.  (Testimony of Crespin, Warren Harris)

33.    It was not necessary for Warren Harris to project his voice as if from across a courtroom for Crespin to hear and understand what he was saying.  (Testimony of Crespin)

34.    Warren Harris became frustrated when Crespin declined to discuss the details of the bench warrant with him.  (Testimony of Warren Harris)

35.    Warren Harris's speech to Crespin was loud and boisterous.  (Testimony of Jeff Jones, Crespin, Deputy Martinez, Deputy Alfred Archibeque, Deputy Marcos Armijo)

36.    Warren Harris's speech was of such a loud and disturbing nature that it caused an attorney in Judge Herrera's courtroom to exit the courtroom to see what was going on in the hallway.  (Testimony of Brad Berge)

37.    Warren Harris's speech to Crespin was of such a loud and disturbing nature that it was heard by Judge Hall's secretary behind closed doors approximately 60 feet from where Warren Harris was addressing Crespin, causing her to leave her desk and look into the hallway to see what the disturbance was about.  (Testimony of Nellie Corriz, Crespin; Defs' Exhs. D, E and F)

38.    The volume and tone of Warren Harris's speech to Crespin was sufficiently loud so as to disturb a conversation between two criminal defense attorneys positioned near the entrance to Judge Herrera's courtroom.  (Testimony of Jeff Jones, Doug Couleur)

39.    The volume and tone of Warren Harris's speech to Crespin disturbed Doug Couleur and prompted him to go to where Warren Harris was addressing Crespin.  (Testimony of

6

Doug Couleur)

40.     The volume and tone of Warren Harris's speech to Crespin disturbed a conversation between two assistant district attorneys seated more than 20 feet from where Warren Harris was addressing Crespin.  (Testimony of Jim Yontz)

41.     The volume and tone of Warren Harris's speech to Crespin drew the attention of another assistant district attorney as he exited the men's room on the far side of the courthouse lobby.  (Testimony of Richard Salazar)

42.     Crespin warned Warren Harris more than once that he needed to quiet down and leave the area   (Testimony of Crespin, Deputy Martinez, Deputy Archibeque, Deputy Armijo)

43.     Crespin tried to prevent the situation from escalating into a breach of the peace. (Testimony of Richard Salazar, Crespin, Deputy Martinez, Deputy Archibeque, Deputy Armijo)

44.     Warren Harris's loud and boisterous speech caused a crowd of between 5 and 25 persons to gather in the immediate area around Warren Harris and Crespin.  (Testimony of Jim Yontz, Crespin)

45.     There were between 15 and 30 in-custody prisoners in the courthouse at the time of the encounter between Warren Harris and Crespin.  (Testimony of Crespin, Deputy Martinez)

46.     Prisoners must be moved to and from the two courtrooms on the western side of the courthouse through the restricted area hallway.  (Testimony of Crespin, Deputy Martinez; Defs' Exh. D, E and F)

47.     The crime of disorderly conduct is defined by NMSA 1978, § 30-20-1(A) to be

7

conduct which is, "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace."

48.    The unreasonably loud and boisterous character of Warren Harris's speech, the observation that a crowd was gathering in the restricted area, the probability that proceedings in the nearby courtrooms would be disturbed if Warren Harris's unreasonably loud and boisterous speech continued and the possible risks that allowing Warren Harris's behavior to continue posed to the security of the courthouse caused Crespin to order that Warren Harris be arrested. (Testimony of Crespin)

49.    The behavior of Warren Harris in the context of all of the prevailing circumstances on the afternoon of June 6, 1997 and his refusal to obey the instruction of Crespin to clear the restricted area constituted probable cause to arrest Warren Harris for violation of NMSA 1978, § 30-20-13(C), which states:

> No person shall willfully refuse or fail to leave the property of or any building or other facility owned, operated or controlled by the state or any of its political subdivisions when requested to do so by a lawful custodian of the building, facility or property if the person is committing, threatens to commit or incites others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of the property, building or facility.

50.    Warren Harris's knowing refusal to obey Crespin's instructions to quiet down and clear the restricted area, which instructions were given in accordance with the orders of the presiding judges, constituted probable cause to arrest Warren Harris for violation of NMSA

8

1978, § 30-22-1(A), which states:

> Resisting, evading or obstructing an officer consists of:
> A. knowingly obstructing, resisting or opposing any officer of this
> state or any other duly authorized person serving or attempting to
> serve or execute any process or any rule or order of any of the
> courts of this state or any other judicial writ or process.

51.     After he was arrested, Warren Harris spoke less loudly when addressing the

officers. (Testimony of Warren Harris, Crespin)

52.     Warren Harris and Tapia were transported from the courthouse to the Santa Fe

County jail very soon after their arrests. (Testimony of Crespin)

53.     Crespin prepared the narrative portion of his report on the incident on June 6,

1997 later that same afternoon. (Defs' Exh B; testimony of Crespin)

54.     The criminal complaint and statement of probable cause charging Warren Harris

with disorderly conduct were prepared by Crespin after he had transported Warren Harris and

Tapia to the jail. Copies of these documents were provided to Warren Harris by Crespin before

Crespin left the jail to return to the courthouse. (Defs' Exh B; testimony of Crespin, Warren

Harris)

55.     Crespin did not become aware of a verbal order by Judge Herrera that Warren

Harris and Tapia not be removed from the courthouse until Judge Herrera had spoken with them

until after he had transported them to the jail. (Testimony of Crespin)

56.     Upon learning of Judge Herrera's order Crespin went back to the jail to retrieve

Warren Harris and Tapia. By that time Warren Harris had been released and was no longer at the jail. (Testimony of Crespin)

57.     Warren Harris spent approximately four hours in detention. (Testimony of Warren Harris, Crespin)

**Plaintiffs' Damages**

58.     Warren Harris had been diagnosed as clinically depressed by his family doctor in late 1995. The causes of the depression were related to family troubles (the unsolved murder of Rose Marie Harris's mother, an episode of deep thrombophlebitis suffered by Rose Marie Harris) and work stress. (Defs' Exh. H; testimony of Dr. Roland Sanchez, Warren Harris)

59.     In March, 1996 Rose Marie Harris was diagnosed with breast cancer. A bilateral radical mastectomy was performed immediately. Plaintiffs received no counseling prior to the surgery to prepare them for the possible emotional and psychological impacts that the surgery and subsequent chemotherapy could have on their relationship. (Testimony of Rose Marie Harris)

60.     Following the surgery Rose Marie Harris was extremely weak. Soon after the surgery she began a long series of chemotherapy treatments over several months which also weakened her. Warren Harris was the person primarily responsible for caring for Rose Marie Harris at home during her convalescence. (Testimony of Rose Marie Harris, Warren Harris)

61.     Aside from caring for his wife during her illness, Warren Harris also had to take full responsibility for running the household, including shopping, paying the bills, cooking and

cleaning. These were tasks which Rose Marie Harris had previously performed. (Testimony of Rose Marie Harris, Warren Harris)

62.    In April, 1997, approximately two months before his arrest, Warren Harris reported that he was tired all the time, was waking up a lot at night with a lot on his mind, had been having night sweats for six months, had recently gained 30 pounds and was drinking 2-3 drinks each evening. These symptoms are consistent with clinical depression. (Testimony of Dr. Richard Pesikoff)

63.    Warren Harris's loud, boisterous, disruptive, irritated and agitated behavior on June 6, 1997 at the courthouse is consistent with existing clinical depression. (Testimony of Dr. Richard Pesikoff)

64.    The experience of being arrested without any accompanying physical or verbal abuse and being detained for a few hours is not life threatening in any accepted sense of the term as it is used in the mental health field. (Testimony of Dr. Richard Pesikoff)

65.    Warren Harris and Rose Marie Harris were misdiagnosed when Dr. Sanchez, who is not a mental health provider, decided that they were suffering from post-traumatic stress syndrome secondary to the June 6, 1997 arrest of Warren Harris. (Testimony of Dr. Richard Pesikoff)

66.    Warren Harris suffered exhibited symptoms consistent with a diagnosis of Major Depression after the June 6, 1997 arrest which was the result of a multitude of stressors. The arrest was not the only or even the predominate proximate cause of Warren Harris's depression.

11

(Testimony of Dr. Richard Pesikoff)

67.     The treatment give to Warren Harris for his depression by Dr. Sanchez was limited to a prescription for Zoloft, an antidepressant, and sporadic counseling.  (Defs' Exh. H; testimony of Dr. Sanchez)

68.     A depressive episode such as that suffered by Warren Harris could have been reversed within six to eight weeks had the treatment of the condition been more aggressive.  (Testimony of Dr. Richard Pesikoff)

69.     The reported lack of any marital relations between plaintiffs is, to a reasonably degree of medical probability, related to the antidepressant medications prescribed to both of them by Dr. Sanchez.  (Testimony of Dr. Richard Pesikoff)

70.     Had Warren Harris's depression been aggressively treated, the interruption of plaintiffs' marital relations would have been much briefer.  (Testimony of Dr. Richard Pesikoff)

71.     Rose Marie Harris suffered a temporary Stress Reaction after the arrest which was fueled by a multitude of stressors and which resolved itself within a few weeks.  She has no current psychological effects directly related to the arrest.  (Testimony of Dr. Richard Pesikoff)

72.     Dr. Pesikoff's training and experience are sufficient to qualify him as an expert witness on the subject of plaintiffs' claims for emotional and psychological damages.  (Defs' Exh N; testimony of Dr. Richard Pesikoff)

73.     The detailed report prepared by Dr. Pesikoff following his personal interviews with plaintiffs confirms that Dr. Pesikoff has sufficient knowledge concerning plaintiffs' claims

12

for emotional and psychological damages to offer helpful expert testimony to the Court. (Defs' Exh M)

74.     Rose Marie Harris recalls three specific times when Warren Harris spoke to her about taking his own life. The first occurred in September or October, 1997, the second occurred in April, 1999 and the third occurred in March, 2000. (Testimony of Rose Marie Harris)

75.     There is no mention in the medical records of Dr. Sanchez or Dr. Morgan of reports of suicidal thoughts or impulses by Warren Harris at or around the three specific times when Rose Marie Harris recalls hearing such things from Warren Harris. (Defs' Exhs I and L; testimony of Dr. Sanchez, Dr. Morgan)

76.     The reaction of Mike Runnels, the District Attorney for the13th Judicial District, to Warren Harris's arrest was that it was, "not a big deal," and he took no disciplinary action against Warren Harris for being arrested. (Testimony of Rose Marie Harris, Warren Harris, Mike Runnels)

77.     Mike Runnels valued Warren Harris in his position as the chief deputy district attorney. (Testimony of Mike Runnels)

78.     Mike Runnels refused Warren Harris's offer to resign following the arrest. (Testimony of Mike Runnels, Warren Harris)

79.     The aspect of Warren Harris's job performance which concerned Mike Runnels when he decided to ask for Warren Harris's resignation in June, 1999 was that Warren Harris was frequently out of the office and was unable to discharge his duties with the effectiveness that

was required by Mike Runnels.  (Testimony of Mike Runnels)

80.     In the six months prior to his resignation from the District Attorney's office, Warren Harris was out of the office for approximately 28 days due to physical illnesses such as asthma and chronic bronchitis.  (Defs' Exhs. H, J and K)

81.     In the opinion of Dr. Sanchez, Warren Harris's respiratory problems were unrelated to his depression.  (Testimony of Dr. Sanchez)

82.     Clifford Morgan, Ph.D., is a clinical psychologist who treated Warren Harris for depression for approximately seven months prior to Warren Harris's resignation from the District Attorney's office.  (Defs' Exh. I)

83.     According to Dr. Morgan, Warren Harris's depression was much improved before June, 1999.  (Defs' Exh. I; testimony of Dr. Morgan)

84.     Mike Runnels's request for the resignation of Warren Harris was not proximately related to Warren Harris's depression.  (Defs' Exhs. J, K; testimony of Warren Harris, Mike Runnels, Dr. Morgan)

## CONCLUSIONS OF LAW

1.     The Court has subject matter jurisdiction of the federal question claims asserted by plaintiffs.

2.     The Court has personal jurisdiction of the parties and venue is properly laid in this District.

3.     The law governing this action are the 4th and 14th Amendments to the United

14

States Constitution, 42 U.S.C. § 1983, the New Mexico Tort Claims Act found at NMSA 1978, §
41-4-1 *et seq.*, and the common law of New Mexico.

     4.      At all times pertinent hereto, defendant Crespin was a deputy sheriff with the
Santa Fe County Sheriff's Department and was acting within the scope of his employment and
under color of state law.

     5.      Crespin is protected by qualified immunity as to the claims arising under the 4th
and 14th Amendments to the United States Constitution because sufficient probable cause existed
under all of the circumstances for the arrest of Warren Harris such that a reasonably competent
law enforcement officer could believe that Warren Harris had committed a crime.

     6.      Crespin had probable cause to arrest Warren Harris for the crime of disorderly
conduct.

     7.      Crespin had probable cause to arrest Warren Harris for the crime of interfering
with the lawful mission, processes, procedures or functions of the courthouse.

     8.      Crespin had probable cause to arrest Warren Harris for the crime of resisting,
evading or obstructing an officer.

     9.      No rights secured to Warren Harris by the 4th and 14th Amendments of the United
States Constitution were violated by defendants.

     10.     Plaintiff's claims for assault, battery, false arrest and false imprisonment are
without merit because Crespin was legally justified in arresting Warren Harris.

     11.     The probable cause to arrest Warren Harris for the crime of disorderly conduct

was legal justification for the filing of the criminal complaint charging Warren Harris with committing that crime.  The claim of malicious abuse of process is without merit as a matter of law.

12.     The claim of loss of consortium asserted by Rose Marie Harris is without merit as a matter of law because the acts of Crespin were lawful.

13.     All defendants enjoy immunity as to plaintiffs' claims for punitive damages

14.     Judgment shall be entered dismissing plaintiffs' claims with prejudice.

VIRTUE NAJJAR BARTELL MATTHEWS &
BROWN, PC


By
       Randy S. Bartell
Attorneys for Defendants
P.O. Box 22249
Santa Fe, New Mexico 87502-2249
(505) 983-6101 ext. 44

16

We hereby certify that we have hand
delivered a copy of the foregoing pleading
to the following counsel of record this 22nd
day of November, 2000:

Michael E. Vigil
Marchiondo, Vigil & Associates
P. O. Box 568
Albuquerque, New Mexico 87103-0568

VIRTUE NAJJAR BARTELL
MATTHEWS & BROWN, PC

By

R2316

17